## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, | No. 4:21-CV-01343 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| LOYALSOCK TOWNSHIP SCHOOL DISTRICT, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### AUGUST 26, 2025

## I.    BACKGROUND

This case stems from child sexual abuse perpetrated by Kelli Vassallo, a former Loyalsock Township School District ("LTSD") coach. Plaintiff Jane Doe has brought suit against the School District, alleging inadequacies regarding its response to Vassallo's abuse of her. After proceeding through the normal course of discovery, Defendant LTSD filed a Partial Motion for Summary Judgment. That motion is now ripe for disposition; for the reasons that follow, the motion is granted in part and denied in part.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."[1] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[2] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[3] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[4]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[5] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[6] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[7] Finally,

---

[1]  FED. R. CIV. P. 56(a).

[2]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[3]  *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

[4]  *Id.*

[5]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[6]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[7]  FED. R. CIV. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

although "the court need consider only the cited materials, . . . it may consider other materials in the record."[8]

## III.    FACTUAL BACKGROUND

As is unfortunately common, child abusers often have more than one victim. That is the case with Vassallo, who abused two minor victims: L.F. and Plaintiff. As the events are relevant to my analysis, I discuss the circumstances surrounding Vassallo's abuse of both minor victims and the School District's response.

### A.    Vassallo's Abuse of Minor Victim One: L.F.

Vassallo's abuse of the first minor victim, L.F., was brought to the attention of Terri Dietrick, a LTSD teacher. by L.F.'s mother in September 2010.[9] L.F.'s mother disclosed that "she [was] having trouble with [Vassallo] and [L.F.] like that [Vassallo] is . . . showing, paying too much attention or something to [L.F.] and that they were trying to stop [L.F.] from being around" her.[10] She also informed Dietrick about "text messages"[11] between the two and that Vassallo bought L.F. "lots of presents."[12]

This conversation prompted Dietrick to approach Christina Herman, another District employee, about this "inappropriate relationship."[13] Herman claimed

---

[8]  FED. R. CIV. P. 56(c)(3).
[9]  Doc. 74-4, Dietrick Dep. at 36:21-25.
[10]  *Id.* at 33:6-13.
[11]  *Id.* at 34:7-13.
[12]  *Id.* at 34:24-35:10.
[13]  Doc. 74-9, Herman Dep. at 32:13-17.

Dietrick brought these concerns to her as she knew she was a mandated reporter for the LTSD.[14] As Vassallo had been "hired as a coach, that became a concern," as she had "access to other young girls . . . in our system through coaching."[15]

After her conversation with Dietrick, Herman proceeded to separately contact Superintendent Robert Grantier and High School Principal Matthew Reitz.[16] Herman "remember[ed] just talking about that there was a reporting. A situation happened with one of our coaches and one of our students, and that it was . . . sexual in nature, and that there was a relationship."[17] She also shared this information with Stanzione, as she was L.F.'s counselor; Herman felt Stanzione should be "aware" that "this School District was in the middle of that situation where this young lady is reported" to be "in a relationship with one of our coaches."[18]

Eventually, a meeting between several members of the LTSD administration and a Pennsylvania State Police ("PSP") trooper occurred, prompting an investigation by the State Police. In a written statement bearing Herman's signature,[19] Herman specifically indicated that a possible sexual relationship existed

---

[14]  *Id.* at 38:9-11.
[15]  *Id.* at 32:13-25.
[16]  *Id.* at 36:8-12, 43:21-44:6.
[17]  *Id.* at 56:1-10.
[18]  *Id.* at 53:5-13.
[19]  Doc. 74-10, Herman 2010 Statement.

between Vassallo and L.F.; although, Herman did not remember typing the statement, she did not disagree with anything in it.[20]

The events surrounding the investigation by the PSP and then the aftermath of this investigation are murky. I discuss the observations by each individual relevant to my analysis below.

### 1. Herman's Observations

Herman clarified that she remembered that L.F. did not intend to press charges and that "there wasn't evidence that there was a sexual in nature relationship with the student and that . . . based on the Pennsylvania State Police investigation" they were not pursuing charges.[21] She specifically noted that she "trust[s]" that "the PSP did a thorough investigation."[22] But Herman noted that she did not "get information about L.F. and" Vassallo from the PSP as "[i]t wouldn't be something that would be required to share with" her.[23] When asked if she "assume[d] there was an ongoing investigation by Loyalsock Township School District administrators after they had follow-up with the Pennsylvania State Police," Herman responded in the affirmative.[24] Herman further offered that she "would assume we did not let that just pass because the police said they weren't going to charge . . . ."[25]

---

[20] Doc. 74-9 at 110:22-25.
[21] *Id.* at 111:8-21.
[22] *Id.* at 114:3-10.
[23] *Id.* at 115:18-23.
[24] *Id.* at 117:5-9.
[25] *Id.*at 119:24-120:1.

### 2.    Reitz's Observations

Herman's notes identified that Reitz was at the September 14, 2010 meeting, but Reitz had no memory of this meeting.[26] He theorized that "additional details were being investigated during that time."[27] Reitz explained that the LTSD "utilized Children & Youth Services more directly for things that might have been happening between siblings or parents or families among those sort of kids" and the State Police for allegations such as those that arose in 2010 against Vassallo.[28] He further offered that they "probably relied upon" the PSP "to interface with Children & Youth."[29]

Reitz similarly had never seen any PSP investigative reports concerning Vassallo before.[30] He learned that the 2010 investigation "was unfounded" "probably through word of mouth from the superintendent at the time."[31] As the acting principal, Reitz had the authority to conduct an internal review after the PSP investigation ended.[32] He also conceded that allegations of inappropriate behavior between a coach and student would be relevant to a decision to continue that coach's employment, but he did not inform any members of the Board of Education of the allegations regarding L.F. and Vassallo in 2010.[33]

---

[26]    Doc. 74-11 at 101:19-25.
[27]    *Id.* at 106:23-24.
[28]    *Id.* at 111:11-22.
[29]    *Id.* at 113:14-17.
[30]    *Id.* at 118:7-11.
[31]    *Id.* at 126:19-24.
[32]    *Id.* at 132:18-23.
[33]    *Id.* at 187:2-16.

### 3.    Corporal McMunn

PSP Corporal Jennifer McMunn[34] met with the School District;[35] she believed then-Superintendent Grantier "related that there was possibly an inappropriate relationship between Kelli Vassallo and a senior, a 17-year-old female of Loyalsock High School" before she met with "various members" of the School District to discuss the case.[36] At this meeting, it was primarily Herman who spoke.[37] McMunn specifically indicated that Herman had been "approached by an anonymous person" that had "concerns" that "Vassallo was in an inappropriate relationship, to include sexual relationship, with a Loyalsock student. . . ."[38] At McMunn's prompting, Herman provided a written statement summarizing the information.[39]

McMunn could not "recall having a conversation with" the LTSD after closing the investigation[40] and speaking with the district attorney.[41] She further noted that she would "not really" provide information regarding the decision to pursue criminal charges "other than speaking with the victim and the victim's mother."[42] However, she eventually noted that "[i]t is possible for [her] to tell the school district that the case might be closed. But as far as the details" relayed by the victim and the

---

[34]  At that time, she was a trooper. Doc. 74-13, McMunn Dep. at 17:2-5.
[35]  *Id.* at 37:17-24.
[36]  *Id.* at 39:13-23.
[37]  *Id.* at 42:10-12.
[38]  *Id.* at 43:7-24.
[39]  *Id.* at 47:1-8.
[40]  *Id.* at 79:3-9.
[41]  *Id.* at 83:11-13.
[42]  *Id.* at 81:1-7.

mother would not have been shared.[43] She also concluded that her final report would not have been shared with the LTSD unless the victim's mother or district attorney decided to share it.[44] Finally, McMunn clarified that she "asked that the conversations that we have not be discussed with other individuals . . . ."[45] But she indicated "as far as an internal investigation, [she] can't tell the school district what they can do internally . . . ."[46]

### B.    Vassallo's Abuse of Plaintiff Jane Doe

Plaintiff explained that she was abused by Vassallo "[f]or a year, plus a year of grooming and manipulation."[47] Plaintiff began to speak with Vassallo, her seventh-grade basketball coach, due to her concerns over a suicidal friend.[48]

### 1.    The Grooming

Over the course of the school year, Vassallo would occasionally text Plaintiff and gave her hugs before or after practice.[49] Towards the end of the basketball season, the texting became more frequent and eventually reached a point of occurring throughout the day.[50] This distracted her as she "would be anticipating a text from [Vassallo] or eager to get one from her."[51]

---

[43] *Id.* at 84:10-16.
[44] *Id.* at 130:8-10.
[45] *Id.* at 131:20-22.
[46] *Id.* at 132:4-6.
[47] Jane Doe Oct. 13, 2023 Dep. at 52:20-25.
[48] Doc. 74-14, Jane Doe Oct. Dep. at 53:12-16, 57:18-58:11, 64:1-4.
[49] *Id.* at 67:11-68:12. They texted approximately three times a week. *Id.* at 71:1-5.
[50] *Id.* at 71:18-20, 75:18-20.
[51] *Id.* at 73:3-7.

After the basketball season ended, Plaintiff and Vassallo spent time together after school.[52] Vassallo "would invite [Jane Doe] over to her house after school or on the weekends."[53] They would watch television, play card games, and do schoolwork together; during this time, L.F. "liv[ed] there with" Vassallo but "would not spend time with" Plaintiff and Vassallo.[54] Jane Doe also indicated that she spent time with Vassallo "at [Kyle and Julie] Rude's house" to watch a television show and she would have dinner with Vassallo's family at their home.[55] She described the Rude's home as "a very welcoming environment" and that she "was welcome there anytime [she] wanted to be."[56]

Eventually, their relationship progressed where they began to "cuddle on the couch" and Vassallo "would hug [her] often, [and] hold [her] hand."[57] At the Rude's house, Vassallo continued to hug and hold Jane Doe's hand but she did not do so with her own family.[58] Vassallo also bought Plaintiff clothes and presents for her birthday.[59]

---

[52] *Id.* at 79:18-22.
[53] *Id.* at 80:13-16.
[54] *Id.* at 81:5-13.
[55] *Id.* at 86:18-22, 89:1-21, 91:23-92:1.
[56] *Id.* at 91:1-4.
[57] *Id.* at 92:24-93:4. Vassallo would lay behind Plaintiff "with her arms wrapped around" her. *Id.* at 97:8-10.
[58] *Id.* at 93:11-25.
[59] *Id.* at 95:25-96:4.

### 2.    The Sexual Abuse

While Plaintiff was at Vassallo's home one day, Vassallo "started to express her feelings towards" her.[60] Jane Doe testified that she began to cry as she "thought that [Vassallo] was telling [her] that . . . [their] relationship was over."[61] At that point, Vassallo "asked [Plaintiff] if she could kiss" her and then proceeded to do so.[62] Plaintiff felt "confused" as she "didn't know what to think" when that happened.[63]

Vassallo's sexual abuse of Jane Doe then progressed rapidly; a week after that first kiss, Vassallo "put[] her fingers down [Plaintiff's] pants for the first time" on her couch.[64] As the abuse continued to "progress[]," Vassallo began to touch Jane Doe in other places, including her breasts and digitally penetrating her vagina.[65] Vassallo specifically instructed Plaintiff not to disclose the abuse.[66] During Plaintiff's eighth grade year, Vassallo initiated sexual contact with her "at least three times a week."[67]

---

[60]    *Id.* at 98:22-99:4.
[61]    *Id.* at 99:8-16.
[62]    *Id.* at 99:17-20.
[63]    *Id.* at 101:17-20.
[64]    *Id.* at 106:6-9.
[65]    *Id.* at 108:12-22.
[66]    *Id.* at 110:18-21.
[67]    *Id.* at 114:21-115:2. On one occasion this abuse occurred at the Rude's house while Vassallo watched their children. *Id.* at 125:4-9.

As Vassallo's abuse of Plaintiff escalated, she also "lost connection with [her] friends to the point where [she] didn't spend any time with any of them."[68] Plaintiff's mother had asked if anything sexual was occurring between Vassallo and her in August 2014, prompting Vassallo to cut off contact.[69]

During the fall of her freshman year, Plaintiff began to "have suspicion" towards the abuse she suffered as Vassallo had "just cut off all ties with [her] out of nowhere."[70] In the aftermath of the abuse ending, Jane Doe described her peers viewing her as depressed.[71]

### 3. Plaintiff Discloses the Abuse

During her sophomore year of high school, Plaintiff first disclosed the abuse to her friend Ana Barone.[72] Barone helped Plaintiff realize "that it wasn't a relationship . . . but it was abuse and it was rape."[73] Barone eventually accompanied Plaintiff when she approached LTSD teacher Jennifer Beck to disclose the abuse.[74] The following day Jane Doe asked Beck if she had reported the disclosed abuse, to which she replied in the affirmative.[75] That same week she also disclosed the abuse to her mother.[76]

---

[68] *Id.* at 115:8-11.
[69] *Id.* at 119:16-23.
[70] *Id.* at 119:1-7.
[71] *Id.* at 132:11-18.
[72] *Id.* at 130:5-13.
[73] *Id.* at 134:10-16.
[74] *Id.* at 135:11-24. 137:20-138:15.
[75] *Id.* at 139:6-18.
[76] *Id.* at 150:3-21.

Eventually, Children and Youth went to conduct an at-home interview with Plaintiff and her parents.[77] The PSP eventually launched an investigation, with Jane Doe speaking with Trooper Miller about the abuse she suffered.[78] Plaintiff testified at the preliminary hearing in the criminal case against Vassallo and eventually provided a victim impact statement at the change of plea hearing.[79]

Over the course of her high school career after she disclosed the abuse, Plaintiff was called into Principal Reitz's office "a few times" and she "specifically" remembered Reitz telling her "that he doesn't want [her] to resent him because he did everything he could."[80] Jane Doe described feeling "angry" in response to this statement as more information about Vassallo's abuse of L.F. had begun to emerge, leading her to conclude "that the school district was aware of it."[81]

## IV.    DISCUSSION

### A.    The Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[82] Title IX is "enforceable through an implied private right of action,"

---

[77]  *Id.* at 156:20-157:2.
[78]  *Id.* at 168:12-169:7.
[79]  *Id.* at 171:13-175:2.
[80]  *Id.* at 143:10-14. Reitz had also seen Vassallo bring Plaintiff to or home from practice and basketball events occasionally.[80] Doc. 74-11 at 158:2-5.
[81]  *Id.* at 143:20-24.
[82]  20 U.S.C. § 1681(a).

with monetary damages available.[83] "[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond."[84] This "response must amount to deliberate indifference to discrimination."[85] Accordingly, a school district "could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."[86]

### 1.    Actual Knowledge

"Actual notice necessitates more than a simple report of inappropriate conduct, however, the standard 'does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.'"[87] "[W]hile actual knowledge does not require absolute certainty that harassment has occurred, there must be more than an awareness of a mere possibility of the harassment."[88] "The educational institution has 'actual knowledge'

---

[83] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1990).

[84] *Id.* at 290.

[85] *Id.*

[86] *Davis Next Friend Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

[87] *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689, 704 (M.D. Pa. 2018) (Mariani, J.) (quoting *Escue v. Northern OK College*, 450 F.3d 1146, 1154 (10th Cir. 2006)).

[88] *Id.* (citing *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005)).

13

if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger."[89]

"Furthermore, the 'actual notice' or 'actual knowledge' must be attributed to an 'appropriate person.'"[90] "An 'appropriate person' is one who, at minimum, 'has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf' to end this discrimination."[91] Consequently, "deliberate indifference requires an 'official decision by the recipient not to remedy the violation.'"[92]

First, I note that the purported disputed facts regarding the awareness of several low-level LTSD employees identified by Plaintiff cannot, alone, defeat summary judgment. Instead, Plaintiff must demonstrate that these individuals are "appropriate persons" for purposes of Title IX. Surprisingly, Plaintiff makes no attempt to do so. Perhaps that is because it is evident that none of these individuals possess the "authority to address the alleged discrimination and to initiate corrective measures on" LTSD's behalf.[93]

However, that does not resolve the issue. The Court reviewed the factual record before it and concludes that sufficient disputes exist as to whether an

---

[89] *Id.* (quoting *Bostic*, 418 F.3d at 361).

[90] *Id.* (quoting *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 169 (3d Cir. 2002)).

[91] *Id.* (citing *Gebser*, 524 U.S. at 290).

[92] *Id.* (quoting *Gebser*, 524 U.S. at 290).

[93] *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 751 (W.D. Pa. 2018) (quoting *Bostic*, 418 F.3d at 360).

"appropriate person" in the LTSD had actual knowledge of Vassallo's abuse of the first minor victim, L.F.

Herman's signed 2010 statement provides a rather extensive narrative, including that then-Superintendent Grantier and Principal Reitz were involved in a phone conversation in which Herman disclosed the allegations concerning L.F. and Vassallo.[94] This signed statement finds further support through Herman's deposition testimony, in which she indicated that she reported to both Grantier and Reitz that "[a] situation happened with one of our coaches and one of our students, and that it was . . . sexual in nature, and that there was a relationship."[95] While this Court has previously observed that there must be "more than an awareness of a mere possibility of the harassment,"[96] that has occurred here. Through Herman's disclosure, "appropriate persons" in the LTSD became aware of serious allegations regarding a sexual relationship between Vassallo and L.F., purportedly based on "first-hand knowledge and information."[97]

Consequently, the only question remaining is whether the result of the PSP's 2010 investigation somehow negated this knowledge. Again, the extensive contradictions in the factual record render this question inappropriate for this Court

---

[94] Doc. 74-10.

[95] Doc. 74-9 at 56:1-10. The Court notes that Reitz testified that he could not remember the meeting identified in Herman's written notes. Doc. 74-11 at 101:19-25. Again, this factual dispute would have to be resolved by the jury.

[96] *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689, 705 (M.D. pa. 2018).

[97] Doc. 74-10

to resolve at the summary judgment stage. Reitz, Herman, and Superintendent Gerald McLaughlin provided mixed explanations as to their understanding of how the PSP's 2010 investigation into Vassallo had resolved and Corporal McMunn could not definitively state what, if any, information would have been shared with the LTSD following conclusion of the investigation.

Under these circumstances, I conclude that a reasonable juror could conclude that appropriate persons in the School District had actual knowledge of Vassallo's abuse of L.F. where the underlying facts indicated Vassallo posed a sufficient danger to students.

## 2.    The District's Response

Similarly, I conclude that sufficient factual disputes exist regarding the LTSD's response to the abuse perpetrated by Vassallo such that a juror could conclude the District displayed deliberate indifference. Deliberate indifference requires a "recipient's response to the harassment or lack thereof" to be "clearly unreasonable in light of the known circumstances."[98]

Here, it is true that the LTSD promptly reported the suspected abuse of L.F. to the PSP and provided information to allow a police investigation to occur. McMunn determined, after consultation with the district attorney's office, that insufficient evidence existed to pursue criminal charges against Vassallo at that time.

---

[98]    *Davis*, 526 U.S. at 648.

While the District now argues that their report to the State Police prevents a finding of deliberate indifference, a reasonable juror could certainly conclude the opposite.

As I have already noted, the factual record before the Court is mixed, and at certain points, contradictory. But a reasonable juror could conclude that the LTSD had knowledge that Vassallo was engaged in a suspected sexual relationship with L.F., as exemplified by Herman's September 27, 2010 statement[99] and her description of the meeting with McMunn.[100] Although this was reported to the State Police, no further action was taken by the School District. That failure to take additional action occurred despite Reitz acknowledging his authority to conduct an internal review[101] and McMunn's description of what limited information would have been shared with the School District at the conclusion of the investigation.[102] Reinforcing this decision is Reitz's acknowledgment that the nature of the allegations concerning L.F. and Vassallo in 2010 would have been relevant to the Board of Education's decision to hire Vassallo, and both Reitz's and McLaughlin's inability to definitively state that the board had become aware of these allegations. Under this version of the disputed facts, a reasonable juror could conclude that the District failed to respond in a reasonable manner to the allegations.

---

[99]   Doc. 74-10.
[100]  Doc. 74-9 at 105:22-111:21.
[101]  Doc. 74-11 at 132:18-23.
[102]  Doc. 74-13 at 81:1-7, 84:10-16, 130:8-10.

### B.    Negligence Per Se Claim

The District also moves for summary judgment on Plaintiff's negligence per se claim for its purported failure to comply with the Child Protective Services Law ("CPSL"). LTSD argues that (1) Plaintiff cannot demonstrate any violation of the CPSL as they reported the allegations concerning Vassallo to the PSP and (2) even if a violation occurred, no causation can be demonstrated. As I am persuaded by Defendant's argument regarding causation, I proceed directly to that point.

First, I note that Plaintiff's brief in opposition merely identified purported factual disputes regarding the LTSD's failure to comply with the CPSL due to earlier instances of the abuse of L.F. Critically, Plaintiff failed to respond at all to the argument that she cannot demonstrate causation. That essentially waives her opposition to this argument such that granting this portion of Defendant's Partial Motion for Summary Judgment is appropriate.[103]

More critically, I agree with Defendant's argument that Plaintiff is unable to establish proximate causation. Although a reasonable juror could conclude that the District acted with deliberate indifference in response to the allegations concerning L.F. and Vassallo, that is a distinct question from whether any failure to follow the

---

[103]   *E.g.*, *7 Eleven Inc. v. Sodhi*, 706 F. App'x 777 n.16 (3d Cir. 2017); *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 522 (W.D. Pa. 2021) ("A party that fails to address an argument in its brief in opposition to a motion for summary judgment waives that argument").

Pennsylvania Child Protective Services Law (CPSL) to the letter satisfies the causation inquiry.

As should be evident, I have conducted an exhaustive review of the factual record in this case. In conducting this review, I failed to identify any evidence to support the premise that a ChildLine investigation in 2010 or later would have altered the events such that proximate causation for this claim is satisfied.[104] As such, without any argument from Plaintiff to the contrary, I grant this portion of Defendant's Partial Motion for Summary Judgment.

## V.    CONCLUSION

For the reasons above, I grant in part and deny in part Defendant's Partial Motion for Summary Judgment.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[104] The Court recognizes the inherent difficulty in this question; however, it is easy to imagine evidence that could support this proposition and allow a reasonable juror to infer facts sufficient to establish proximate causation. For example, identifying differences in investigative techniques by ChildLine and the PSP could serve to suggest a more exacting inquiry would have been conducted by ChildLine, if that were the case.